## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MONICA RODRIGUEZ and CYRILLE GUILLAUME, individually and on behalf of all others similarly situated, | CASE NO. _____ |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| vs. | **DEMAND FOR JURY TRIAL** |
| JON S. CORZINE, BRADLEY I. ABELOW, J. RANDY MACDONALD, HENRI J. STEENKAMP, DAVID P. BOLGER, ALISON J. CARNWATH, EILEEN S. FUSCO, DAVID GELBER, MARTIN J. GLYNN, EDWARD L. GOLDBERG, DAVID I. SCHAMIS and ROBERT S. SLOAN, | |
| Defendants. | |

## NATURE OF THE CASE

1.      This is a class action lawsuit on behalf of current and former employees of MF Global Holdings Ltd., and its subsidiaries who acquired MF Global common shares through the 2007 Amended and Restated Long Term Incentive Plan and the Employee Stock Purchase Plan ("ESPP"), and other similar or related plans (together, the "Plans").  Under the Long Term Incentive Plan, eligible employees received grants of incentive share options, non-qualified share options, share appreciation rights, restricted shares, restricted share units and other awards.  The ESPP allowed participating employees to defer a portion of their cash wages to purchase MF Global stock at a discounted price.

2.      Prior to its bankruptcy on October 31, 2011, MF Global was a commodities broker operating in over 70 markets worldwide.  In 2010, former New Jersey governor and

United States senator Jon S. Corzine took the reins as the company's chairman and chief executive officer.  Before his foray in politics, Corzine worked at the Goldman Sachs Group, eventually rising to co-CEO alongside future Treasury Secretary Henry M. Paulson.

3.     Shortly after his arrival, Corzine implemented a new strategic plan for MF Global designed to transform the company from a dedicated commodities broker into a global investment bank.  That plan focused on increased proprietary trading, much of it highly leveraged and involving risky assets.  Most notably, the company acquired around $6.3 billion in the sovereign debt of Spain, Italy, Belgium, Portugal, and Ireland.  In May 2011, the company disclosed that it held European sovereign debt, but did not disclose the crippling effect the position had on the company's operations.

4.     Regulators began to question the logistics of the new strategy, including MF Global's increased reliance on "repurchase-to-maturity" transactions and deteriorating capital. In June, MF Global and the Financial Industry Regulatory Authority ("FINRA") discussed whether the company had to raise more capital because of the company's exposure to European debt.  Reportedly, FINRA also raised concerns that the company's off balance sheet treatment of its debt exposure did not comply with Generally Accepted Accounting Principles ("GAAP").

5.     Despite their knowledge of these problems, defendants continued to present MF Global as a healthy, well-capitalized company in the midst of a successful transition to an investment bank.  But beginning on October 24, 2011, the truth began to emerge.  On that day, Moody's downgraded the company's credit rating, citing its capital and operational environment. MF Global declared a quarterly loss the next day, and revealed the full extent of its European indebtedness.  The Commodities Futures Trading Commission raised concerns about the company's potential misappropriation of client funds—later estimated to range from $600

million to $1.2 billion—to cover margin calls on its deteriorating debt positions. These concerns discouraged potential buyers, forcing the company to seek bankruptcy protection on October 31, 2011. In its bankruptcy court filings, the company disclosed that it had a leverage ratio of approximately 40 to 1.

6. On November 1, 2011, NYSE Regulation, Inc. announced that MF Global's stock would no longer be listed on the New York Stock Exchange. The company's stock now trades over the counter for approximately 14 cents per share.

7. As of March 31, 2011, MF Global had 2,847 employees. Many of these employees acquired MF Global stock or options to purchase MF Global stock through the Plans. Since its initial public offering in July 2007, MF Global employees acquired approximately 21.9 million shares of stock under the Plans.

8. Plaintiffs assert federal securities law claims against defendants on behalf of a class of all current and former MF Global employees who participated in the Plans and a state law claim for breach of fiduciary duty and/or tortious interference with breach of fiduciary duty on behalf of a subclass of participants in the ESPP against MF Global's directors. Plaintiffs do not assert claims against MF Global because of the automatic stay of proceedings against it under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a).

## THE PLANS

9. The ESPP was designed "to provide Eligible Employees with an opportunity to increase their proprietary interest in the success of the Company by purchasing Shares from the Company on favorable terms and to pay for such purchases through payroll deductions." Under this plan, employees of MF Global and its subsidiaries could divert between 1% and 15% of their compensation to invest in MF Global shares sold at 85% of their current fair market price, with

purchases made twice per year.  MF Global's Board of Directors had the power to appoint

members of a committee to administer the ESPP or to administer the ESPP directly.

10.     The stated purpose of the Long Term Incentive Plan was "to enable the Company

to attract and retain highly qualified personnel who will contribute to the Company's success and

to provide incentives to [employees] that are linked directly to increases in shareholder value and

will therefore inure to the benefit of all shareholders of the Company."  The Incentive Plan

provided eligible employees with grants of incentive share options, non-qualified share options,

share appreciation rights, restricted shares, restricted share units and other awards.  Restricted

stock generally vests in increments over three years.  The Compensation Committee

administered the Incentive Plan.  In 2011, the Compensation Committee consisted of Chairman

David Gelber, Martin J. Glynn, Edward Goldberg, and David Schamis.

**THE PARTIES**

**Plaintiffs**

11.     Plaintiff Monica Rodriguez is an individual who resides in Caldwell, New Jersey

and was employed by MF Global as Head of Credit for MF Global – The Americas from 2000

until she was terminated on November 11, 2011.  Ms. Rodriguez purchased MF Global common

stock through the Plans, as set forth in her certification, and was damaged.

12.     Plaintiff Cyrille Guillaume is an individual who resides in London, England and

was employed by MF Global from 2006 until he was terminated on November 11, 2011.  Mr.

Guillaume was the Managing Director of the MF Global Paris office before moving to London to

serve as the Managing Director of the Commodities and Stock Division.  Mr. Guillaume

purchased MF Global common stock through the Long Term Incentive Plan, as set forth in his

certification, and was damaged.

**Defendants**

13.     Defendant Jon S. Corzine joined MF Global in 2010 and served as its Chairman and Chief Executive Officer until his resignation on November 4, 2011.  Corzine previously served as New Jersey's 54th governor from January 2006 to January 2010, and represented New Jersey in the United States Senate from January 2001 to January 2006, where he served on the Senate Banking, Budget, Energy and Natural Resources, and Intelligence Committees.  Prior to serving in the Senate, Corzine was the Chairman and Senior Partner of The Goldman Sachs Group, L.P. from December 1994 to June 1998 and Co-Chairman and Co-Chief Executive Officer of The Goldman Sachs Group, L.P. from June 1998 to January 1999.  According to the company's Definitive Proxy Statement filed with the SEC on July 7, 2011 (the "Proxy Statement"), Corzine served as chair of the Executive Committee.  Corzine signed MF Global's 2011 Form 10-K filed with the SEC on May 20, 2011 (the "2011 10-K"), MF Global's 2010 Form 10-K filed with the SEC on May 28, 2010 (the "2010 10-K"), and the company's Form 10-Qs filed with the SEC on August 6, 2010, November 5, 2010, February 3, 2011, and August 3, 2011.  Corzine also signed numerous certifications pursuant to the Sarbanes-Oxley Act of 2002.

14.     Defendant Bradley I. Abelow is the President and Chief Operating Officer of MF Global.  Abelow joined the Company in September 2010 as Chief Operating Officer and became President in March 2011.  Upon information and belief, he oversees the day-to-day execution of MF Global's strategy and holds direct responsibility for risk, operations, client services, human resources, information technology, procurement and real estate activities.

15.     Defendant J. Randy MacDonald is the Head of Retail at MF Global.  MacDonald joined the company in 2008.  Upon information and belief, he had responsibility for managing the retail global business.  MacDonald was also Chief Financial Officer of MF Global for three

years.  MacDonald signed the 2010 10-K and the company's Form 10-Qs filed with the SEC on August 6, 2010, November 5, 2010, and February 3, 2011.  MacDonald also signed numerous certifications pursuant to the Sarbanes-Oxley Act of 2002.

16.     Defendant Henri J. Steenkamp is the Chief Financial Officer at MF Global. Steenkamp joined the predecessor to the company, Man Financial, in 2006, and became Chief Financial Officer in April 2011.  Upon information and belief, he had responsibility for the company's financial operations, including treasury, accounting and all global financial control and reporting functions.  Steenkamp signed the 2011 10-K, the 2010 10-K, and the company's Form 10-Q filed on August 3, 2011.  Steenkamp also certified the 2011 10-K and the August 3, 211 10-Q pursuant to the Sarbanes-Oxley Act of 2002.

17.     The defendants identified in paragraphs 13 through 16 are MF Global senior officers who are (or were) responsible for the company's management, risk management and disclosure responsibilities.  They are referred to collectively as the "Officer Defendants."

18.     Defendant David P. Bolger is a member of the Board of Directors.  According to the Proxy Statement, Bolger served as a member of the Audit and Risk Committee and the Nominating and Corporate Governance Committee.  Bolger signed the 2010 10-K and the 2011 10-K.

19.     Defendant Alison J. Carnwath was a member of the Board of Directors until her retirement in August 2010.  Carnwath signed the 2010 10-K.

20.     Defendant Eileen S. Fusco is a member of the Board of Directors.  According to the Proxy Statement, Fusco served as a chair of the Audit and Risk Committee and as a member of the Nominating and Corporate Governance Committee and the Executive Committee.  Fusco signed the 2010 10-K and the 2011 10-K.

21.     Defendant David Gelber is a member of the Board of Directors.  According to the Proxy Statement, Gelber served as the chair of the Compensation Committee and as a member of the Audit and Risk Committee and the Executive Committee.  Gelber signed the 2010 10-K and the 2011 10-K.

22.     Defendant Martin J. Glynn is a member of the Board of Directors.  According to the Proxy Statement, Bolger served as a member of the Audit and Risk Committee and the Compensation Committee.  Glynn signed the 2010 10-K and the 2011 10-K.

23.     Defendant Edward L. Goldberg is a member of the Board of Directors.  According to the Proxy Statement, Goldberg served as chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee and the Executive Committee.  Goldberg signed the 2010 10-K and the 2011 10-K.

24.     Defendant David I. Schamis is a member of the Board of Directors.  According to the Proxy Statement, Schamis served as a member of the Audit and Risk Committee and the Compensation Committee.  Schamis signed the 2010 10-K and the 2011 10-K.

25.     Defendant Robert S. Sloan is a member of the Board of Directors.  Sloan signed the 2010 10-K and the 2011 10-K.

26.     Defendants Corzine, Bolger, Carnwath, Fusco, Gelber, Glynn, Goldberg, Schamis, and Sloan are referred to collectively as the "Director Defendants."

27.     The Proxy Statement highlighted the role played by the Director Defendants in risk management and oversight.  By overseeing the company and its risk profile, the Director Defendants were in a unique position to determine whether continued investment in MF Global stock was reasonable and prudent under the Plans.  Further, based on their insight, the Director Defendants—along with the Officer Defendants—knew or should have known that the

statements made about the company's financial condition were false and misleading.

28.     The Officer Defendants and the Director Defendants, because of their positions in the company, had the power to control the contents of MF Global's public statements. Further, because of their access to material non-public information, each of the Officer Defendants and the Director Defendants knew that the adverse facts had not been disclosed and that the representations being made were materially false and misleading.

## JURISDICTION AND VENUE

29.     This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.  The Court has jurisdiction over the state law claim for breach of fiduciary duty and/or tortious interference with breach of fiduciary duty under 28 U.S.C. §1367.

30.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because the defendants conduct business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

31.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## CLASS ACTION ALLEGATIONS

32.     Plaintiffs bring this case as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the following class and subclass:

    a.     The class includes all employees of MF Global who, between May 20, 2010 and November 3, 2011, acquired MF Global shares and options through the Plans and any other similar or related plans and who were

damaged thereby.

b.      The subclass includes all employees of MF Global who, between May 20, 2010 and November 3, 2011, acquired MF Global common stock through the ESPP and who were damaged thereby.

c.      Excluded from the class and subclass are defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

33.     The members of the class and subclass are so numerous that joinder of all members is impracticable.  While the exact numbers of class and subclass members are unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds of members in both the class and subclass.  As of March 2011, the company reported in the 2011 10-K that it had 2,847 employees.  MF Global Inc., the company's broker-dealer, employed over 1,000 people in the United States alone.  Members of the class and the subclass may be identified from MF Global's records and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

34.     Plaintiffs' claims are typical of the claims of the members of the class and subclass, as all were employees of MF Global who invested in MF Global stock through the Plans.

35.     Plaintiffs will fairly and adequately protect the interests of the members of the class and subclass and have no conflict with or are antagonistic to the interests of class or subclass members.  Plaintiffs have retained counsel competent and experienced and capable of

prosecuting class actions and securities litigation.

36.     Common questions of law and fact exist as to all members of the class and subclass and predominate over any questions solely affecting individual class and subclass members.

37.     Among the questions of law and fact common to the class are:

  a.     whether the defendants violated federal securities laws;

  b.     whether statements made by defendants misrepresented material facts about the business, operations and management of the company; and

  c.     to what extent the members of the class have sustained damages and the proper measure of damages.

38.  Among the questions of law and fact common to the subclass are:

  a.     whether the Director Defendants owed a fiduciary duty to the subclass;

  b.     whether the Director Defendants breached that fiduciary duty to the subclass; and

  c.     whether the Director Defendants had a duty to keep the subclass members reasonably informed of all facts and circumstances relating to their decision to participate in the ESPP.

39.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual class and subclass members may be relatively small, the expense and burden of individual litigation make it virtually impossible for class and subclass members to seek redress for the wrongful conduct alleged.  Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## SUBSTANTIVE ALLEGATIONS

**A.**   **False and Misleading Statements**

40.     Shortly after his arrival in March 2010, Corzine established a new strategic plan
to expand MF Global's footprint beyond the commodities markets.  In a press release filed with
the SEC on May 20, 2010, Corzine stated that the company "has tremendous potential and a
timely opportunity to make significant inroads into the broader financial services industry."  In a
conference call on the same day, Corzine said that even though the new plan would "encourage
facilitation desks to operate more aggressively," he did not "anticipate increasing our current risk
appetite in the near-term."

41.     Seven days later, on May 28, 2010, the company issued the 2010 10-K.  In it, the
company discussed its risk management procedures as "embed[ding] a robust risk-management
environment through a strong governance structure" and utilizing "approved methodologies for
the identification, measurement, control, and mitigation of risk."  Specifically, with regard to
operational risk, the company stated that it had established a "globally consistent operational risk
management framework" designed to "create a more transparent and accountable operational
risk environment."  MF Global also discussed its regulatory capital requirements, stating that it
"continuously evaluate[s] the levels of regulatory capital at each of our operating subsidiaries
and adjust the amounts of regulatory capital as necessary to ensure compliance with all
regulatory capital requirements."

42.     In an August 5, 2010 conference call discussing the company's 1Q fiscal 2011
results, Corzine said that although MF Global was "executing more principal transactions," it
had "implemented these activities with a high turnover philosophy, confirmed in part by the
reduced size of our balance sheet and our unchanged usage of regulatory capital."  Corzine also
said that the new strategic plan had been implemented "without a significant buildup in our

measured value at risk," which he said was "confirmed in part by the reduced size of our balance sheet and our unchanged usage of regulatory capital."

43.     On the same call, MacDonald said that the company was keeping a "very liquid balance sheet" and was "making sure that we actually have viable stress test[s] against positions." MacDonald also said that MF Global "maintains a strong liquidity position."

44.     On August 6, 2010, MF Global filed its Form 10-Q for the first fiscal quarter of 2011. As it had in the 2010 10-K, the company stated that it "continuously evaluate[s] the levels of regulatory capital at each of our operating subsidiaries and adjust the amounts of regulatory capital as necessary to ensure compliance with all regulatory capital requirements" and had established a "globally consistent operational risk management framework" designed to "create a more transparent and accountable operational risk environment." Corzine and MacDonald signed Sarbanes Oxley certifications related to this 10-Q.

45.     On a November 4, 2010 conference call, Corzine stated that the company had "cautiously moved into dealer and strategic trading activities" and had "established a Principal Strategies Group to enhance revenue growth and help build a measured risk taking culture." Corzine said that the company was going to "go slow" in increasing its proprietary trading activities because, among other reasons, the company had "historically worked from a broker model and had less understanding a comfort with a market making risk management with respect to activities in risk taking." Corzine also said that the company "will be in the liquid in for the most part of our activities."

46.     On November 5, 2010, MF Global filed its Form 10-Q for the second fiscal quarter of 2011. As it had in the 2010 10-K and the August 6, 2010 10-Q, the company stated that it "continuously evaluate[s] the levels of regulatory capital at each of our operating

subsidiaries and adjust the amounts of regulatory capital as necessary to ensure compliance with all regulatory capital requirements" and had established a "globally consistent operational risk management framework" designed to "create a more transparent and accountable operational risk environment." Corzine and MacDonald signed Sarbanes Oxley certifications related to this 10-Q.

47. The company issued a press release on February 3, 2011, discussing its financial results for the third fiscal quarter of 2011. In the press release, Corzine is quoted as describing the progress of MF Global's transformation from "a broker, to a broker-dealer, and eventually to a commodities and capital markets focused global investment bank" and stating that the transition could "fundamentally change our growth trajectory and profitability profile by delivering our clients a more comprehensive package of risk intermediation services" and that, as a result, shareholders could expect "stable, double-digit returns." The press release quoted MacDonald as saying that the company was "using [its] assets … more effectively than ever," as evidenced by its "enhanced productivity, the resizing of our matched repo book relative to market opportunity, improved leverage ratios, increased client confidence and payables as well as an improving earnings profile." The company also announced that it had hired Michael Stockman as Chief Risk Officer to "oversee management of the firm's global risk profile including market, credit and operational risk."

48. On February 3, 2011 MF Global filed its Form 10-Q for the third fiscal quarter of 2011. As it had in the 2010 10-K and the August 6, 2010 and November 5, 2010 10-Qs, the company stated that it "continuously evaluate[s] the levels of regulatory capital at each of our operating subsidiaries and adjust the amounts of regulatory capital as necessary to ensure compliance with all regulatory capital requirements" and had established a "globally consistent

operational risk management framework" designed to "create a more transparent and accountable operational risk environment." Corzine and MacDonald signed Sarbanes Oxley certifications related to this 10-Q.

49.     On the company's May 19, 2011 conference call, Corzine said that although "measured risk taking will be a part of our build out to an investment bank," and that "[t]he path to a more diversified revenue model may, from time-to-time, include periods of risk concentration as opportunities present themselves and our business model matures," "diversity of exposure and revenues is key to our risk management philosophy." Corzine also discussed the company's capital structure, saying that he "didn't like our capital structure when I came in" because the company was "undercapitalized." Corzine stated that the company had "taken steps to address those issues." Steenkamp discussed MF Global's position in European sovereign debt:

> As Jon mentioned, we saw principal trading opportunities in European sovereigns this quarter. By entering into resale and repurchase transactions to maturity, as we do in U.S. government securities, we were able to capture arbitrage opportunities in these markets. We believe the market risk to these trades is minimal as these are held to maturity. While we retain exposure to the underlying credit throughout the maturity period, the duration of these trades is short-term in nature.

50.     On May 20, 2011, MF Global filed the 2011 10-K with the SEC. Corzine and Steenkamp signed Sarbanes-Oxley certifications related to the 10-K. In the 10-K, the company discussed the implementation of the new strategic plan over the last fiscal year. The new business model focused on four major areas: institutional capital markets, retail service, transaction services, and asset management. The company disclosed that as part of the new strategy it "may take proprietary positions in fixed income and related interest rate products, equities, foreign exchange and commodities to monetize our views on future movements in

market prices and volatilities in commodities, securities and other instruments and products."

Similarly, MF Global disclosed that it expected "to increase our principal trading activities

significantly, in connection with facilitating our clients' transactions, our market-making and our

proprietary activities and investing, and as a result, our exposure to market risk and trading

losses will increase."

     51.    Also in the 2011 10-K, MF Global made the following representation about its

risk management and controls in effect at the company:

> We believe that effective risk management is critical to the success of our
> business and is the responsibility of all of our employees. All of our employees
> are risk managers. Employees are expected and encouraged to escalate incidents
> and any matters of concern to management and to our compliance and risk
> departments in order to effectively manage risk. Consequently, we have
> established—and continue to evolve and improve—a global enterprise wide risk
> management framework that is intended to manage all aspects of our risks. The
> risk-management framework is designed to establish a global, robust risk-
> management environment through a strong governance structure that (i) defines
> roles and responsibilities, (ii) delegates authority for risk control and risk taking to
> specific businesses and risk managers, and (iii) documents approved
> methodologies for the identification, measurement, control and mitigation of risk.

> We seek to identify, assess, measure, monitor and limit market, credit and
> operational risks across our businesses. Business areas, pursuant to delegated
> authority, have primary responsibility for risk management by balancing our
> ability to profit from our revenue-generating activities with our exposure to
> potential losses. Working with the business areas, the Risk department serves as
> an advisor and facilitates operation within established risk tolerances while
> seeking to provide acceptable risk-adjusted returns in a controlled manner. Risk-
> department teams also regularly communicate with our regional officers and to
> local decision-making bodies to allow us to react rapidly to address any
> developing risks.

> Our Chief Risk Officer, who reports to our President and Chief Operating Officer,
> leads the risk department and monitors and reports on our risk matters, including
> regular reports to our Board of Directors and Audit and Risk Committee. The
> Chief Risk Officer promotes company-wide adherence to MF Global's enterprise
> risk management framework and has global responsibility for monitoring and
> facilitating control of market, credit and operational risks.

> Senior management takes an active role in the risk management process and
> expects employees to understand and comply with their delegated risk
> responsibilities, relevant risk policies, and compliance requirements. Additionally,

employees are expected and encouraged to escalate risk incidents and any matters
of concern to management in accordance with our internal escalation policy to
promote timely risk-mitigation action by the appropriate personnel.

Reports detail global risk exposures and escalate risks that exceed defined
thresholds. Our risk reporting process is designed to enable us to assess the levels
of risk present throughout our operating environment and to take any necessary
remedial action in a timely manner. As part of this reporting process, risk reports
detailing global risk exposures and escalating risks that exceed defined thresholds
are regularly generated.

52.     On July 28, 2011, the company issued a press release discussing its financial
results for the first fiscal quarter of 2012.  The press release quoted Corzine as stating that
"[w]ith net revenue and GAAP net income at their highest levels in nearly three years, this
quarter's results reflect continued progress in MF Global's ongoing transformation."  The press
release stated that the increase in revenue was "primarily due to the expansion of client
facilitation and principal activities, particularly within structured equity finance, commodities
and fixed income."  On a conference call held on the same day, Steenkamp reiterated that the
company "continue[s] to believe market risks to these trades is minimal as these are held to
maturity."

53.     On August 3, 2011, MF Global filed its Form 10-Q for the first fiscal quarter of
2012.  Corzine and Steenkamp signed Sarbanes-Oxley certifications.  In the 10-Q, the company
discussed its quarterly financial results and future business prospects.  As to the company's
liquidity, the 10-Q states:

The amended liquidity facility continues to provide that if (i) the Company fails to
pay any amount when due under the facility, or to comply with its other
requirements mentioned above, (ii) the Company fails to pay any amount when
due on other material debt (defined as $50,000 or more in principal) (iii) other
material debt is accelerated in whole or in part by the lenders, or (iv) upon certain
events of liquidation or bankruptcy, an event of default will occur under the
facility. Upon an event of default, all outstanding borrowings, together with all
accrued interest, fees and other obligations, under the facility will become due and
the Company will not be permitted to make any further borrowings under the
facility. In May 2011, for purposes of prudent liquidity management, the

Company borrowed $50,000 from the liquidity facility. In March 2011, also for purposes of prudent liquidity management, the Company borrowed $75,000 from the liquidity facility, which was subsequently repaid in April 2011. As of June 30 and March 31, 2011, $342,000 and $367,000, respectively, was outstanding under the liquidity facility with the remainder available to the Company. The Company has Classified the $342,000 of outstanding borrowings at June 30, 2011 under the liquidity facility as short term debt. In connection with the Amendment, the Company paid a one-time fee to participating lenders of $6,818 recorded in Other assets which will be amortized over the life of the facility.

At June 30, 2011, the Company was in compliance with its covenants under the liquidity facility.

*     *     *

The Company conducts its securities and commodities businesses though several regulated subsidiary entities around the world which are subject to the rules and regulations of the applicable local supervisory authorities and principal exchanges of which they are members. These supervisory authorities and exchanges each have defined capital requirements which the respective subsidiaries of the Company are subject to. The two principal subsidiary entities of the Company conducting such business are MFGI in the U.S. and MF Global UK Limited ("MGFUKL") in the U.K. MFGI, a futures commission merchant and securities broker-dealer, is required to maintain minimum net capital equal to the greater of the amount required by the SEC or CFTC, as defined. At June 30, 2011, MFGI had net capital, as defined, of $570,931, net capital requirements of $399,976, and excess net capital of $170,955.

MFGI is subject to certain notifications and other provisions of the net capital rules of the SEC regarding advances to affiliates, repayments of subordinated liabilities, dividend payments and other equity withdrawals. At June 30, 2011, MFGI was in compliance with all of these provisions.

In accordance with the rules of the FSA in the U.K., the Company's FSA-regulated subsidiary, MFGUKL, must comply with the financial resources requirements of the European Union's Capital Requirements Directive. The capital held is intended to absorb unexpected losses and a minimum requirement is calculated in accordance with a standard regulatory formula that addresses the exposure to counterparty credit risk, position/market risk, foreign exchange risk, operational risk and concentration risk. Counterparty risk is calculated as a percentage of unpaid customer margin for exchange traded business and an exposure calculation for off-exchange business. Position risk is calculated by applying percentages to positions based on the underlying instrument and maturity. However, for the purposes of prudential supervision, the Company as a consolidated group, is not subject to the consolidated regulatory capital requirements of the European Union's Capital Requirements Directive.

At June 30, 2011, MFGUKL had financial resources in total, as defined, of $622,110, resource requirements of $438,426, and excess financial resources of $183,684. Regulators may, in addition to setting minimum capital requirements, require that regulated firms hold capital over the minimum amounts as early warning levels to address potential risk which may crystallize in periods of market stress.

The Company's other regulated subsidiaries are also subject to the respective requirements of other regulatory bodies and exchanges of which they are members in other international locations in which they conduct business. The Company's other regulated subsidiaries were in compliance with all of the respective capital requirements at June 30, 2011 and 2010.

*       *       *

The Company provides institutional clients with access to, liquidity in, and insight into commodities, equities, fixed income and foreign exchange, as well as futures and options markets. The Company will build on its strong position in the brokerage business by deepening its involvement in certain markets, by extending its involvement as a principal on a proprietary basis as well as to facilitate more of its client's transactions and widening its range of services. Although the Company historically has frequently taken a principal position to facilitate clients complete trades and began to increasingly trade for its own account since fiscal 2011, the Company intends to expand its role in market making and principal trading, and to use its capital to trade on a proprietary basis. In fiscal 2011 the Company established a principal strategies group and expanded its principal trading activities. Over the longer term, the Company intends to complement this expanded role in principal trading by participating in other elements of traditional investment banking, including underwriting new issues of securities, structuring trades and providing advisory services to issuers, with a continuing focus on the commodities and natural resources markets.

*       *       *

The Company has multiple sources of liquidity and expects its primary liquidity needs over the next 12 months to be for working capital, debt service obligations and preferred dividend obligations. Subject to the discussion below regarding its changing liquidity needs as a result of the implementation of its strategic plan, the Company believes it will have sufficient liquidity to meet these obligations given its expected cash flows from operations and its available sources of liquidity. The Company's available sources of liquidity as of June 30, 2011 included: (i) its committed $1,200.9 million unsecured revolving liquidity facility with various banks, which the Company refers to as its "liquidity facility", of which $511.3 million terminates in June 2012 and $689.6 million terminates in June 2014, and under which it currently has $342.0 million outstanding and $858.9 million that is

undrawn under this facility at June 30, 2011, (which includes $50.0 million drawn in May 2011 for the purposes of prudent liquidity management); (ii) its U.S. regulated broker-dealer subsidiary's committed $300.0 million 364-day secured revolving credit facility, which the Company refers to as its "MFGI secured facility"; (iii) available excess capital in its regulated subsidiaries, the withdrawal of which is subject to regulatory approval; and (iv) available excess cash held in the bank accounts of non-regulated subsidiaries. See "—Credit Facilities and Sources of Liquidity" for further information. In addition, the Company has customer collateral that is not included on its balance sheet but can be re-hypothecated by the Company, and non-segregated customer payables, both of which may be considered (depending, among other things, on where the collateral is located and the regulatory rules applicable to the collateral) an additional layer of liquidity. Non-segregated customer cash in certain jurisdictions is also available for other client liquidity demands which helps mitigate the use of the Company's own cash. The Company also relies on uncommitted lines of credit from multiple sources to fund its day-to-day execution and clearing operations.

*     *     *

As a matter of policy, the Company maintains excess capital to provide liquidity during periods of unusual market volatility, which has been sufficient historically to absorb the impact of volatile market events. Similarly, for its brokerage activities in the OTC markets involving transactions when the Company acts as principal rather than as agent, the Company has adopted a futures-style margin methodology to protect the Company against price movements. A futures-style margin methodology allows the Company to reduce the amount of capital required to conduct this type of business because the Company is able to post client deposits, rather than its own funds, with clearing organizations or other counterparties, if required. In determining its required capital levels, the Company also considers the potential for counterparty default on a large transaction, which would require liquidity to cover such default, or a settlement failure due to mismatched settlement instructions. In many cases, other stock or securities can be pledged as collateral for secured lending to guard against such failure. As a result, the Company is able to execute a substantial volume of transactions without the need for large amounts of working capital.

Funding for purposes other than working capital requirements, including the financing of acquisitions, has been provided either through internally generated cash flow or through specific long-term financing arrangements.

54.    Also in the August 3, 2011 10-Q, MF Global described the company's risk

controls and procedures:

The Company's enterprise risk governance framework involves the oversight of its Board of Directors together with the Company's risk oversight committees,

policies and procedures, and defined delegation of authority. The Company's Board-approved risk appetite and strategic objectives translate to defined risk tolerances and oversight processes and, subsequently, strictly enforced delegations of authority and concomitant controls, which are designed to ensure its operation within those risk tolerances.

The Chief Risk Officer ("CRO"), who reports to the Company's President and Chief Operating Officer, leads the Risk department and is delegated certain authorities from the Board. The CRO reports and advises on market, credit, issuer and operational risk matters. The CRO and senior management promote companywide compliance to its enterprise risk management framework. The CRO is supported by several regional risk officers and a global team to implement the framework.

The risk oversight committees monitor and manage risk company-wide and report on risk at the Board and senior management levels. Dedicated committees address various financial, non-financial and regional risks. The Company's senior management leads and actively participates in many of these risk committees. Risk officers are active participants in many strategic and business committees. The Company believes that effective risk management is only possible with effective communication and maintaining an open dialogue between the Board, senior management, business areas, and the Risk department.

The enterprise risk management framework employs this governance structure, which is intended to embed a strong risk culture and clearly define roles and responsibilities for risk taking, processing, reporting, and control. The enterprise risk management framework comprises the activities and methods through which the Company maintains risk within acceptable risk tolerances. Business areas, pursuant to delegated authority, have primary responsibility for risk management. Working with the business areas, the Risk department seeks to identify, assess, measure, monitor and limit the risks consistently across the Company's businesses. The internal audit department and audit committee further provide independent control and assurance of the risk-management process.

55.     The August 3, 2011 10-Q also described the company's need for operating capital

to maintain its clearing services business:

The Company's ability to provide clearing services, which is a critical part of its business, depends heavily on its ability to maintain capital at its operating subsidiaries, including equity capital at or above specified minimum levels required by various regulators throughout the world. Additionally, principal trading activities have higher regulatory capital requirements than agency execution and clearing activities. The Company also needs capital and liquidity to protect the Company against the risk of default by its clearing clients and against clearing and settlement payment delays caused by systemic problems outside its

control in one country or between countries. Various domestic and foreign government regulators, as well as self-regulated organizations (such as exchanges), with supervisory responsibility over its business activities require the Company to maintain specified minimum levels of regulatory capital in its operating subsidiaries.

To mitigate this risk, the Company continuously evaluates the levels of regulatory capital at each of its operating subsidiaries and adjusts the amounts of regulatory capital as necessary to ensure compliance with all regulatory capital requirements. Regulatory authorities may increase or decrease these requirements from time to time. The Company also maintains internal early warning levels and excess regulatory capital to accommodate periods of unusual or unforeseen market volatility, and the Company intends to continue to follow this policy. In addition, the Company monitors regulatory developments regarding capital requirements and prepares for increases in the required minimum levels of regulatory capital that may occur in the future. If not properly monitored and adjusted, its regulatory capital levels could fall below the required minimum amounts set by its regulators, which could expose the Company to various sanctions ranging from fines and censure to partial or complete restrictions on its ability to conduct business.

56.     In the August 3, 2011 10-Q, MF Global discussed several potential risks that

could arise in the course of business:

Cash liquidity risk is the risk that, in the normal course of business, the Company would be unable to generate cash resources to meet its payment obligations as they arise. The Company's core business, providing execution and clearing brokerage services, does not generally present substantial cash liquidity risk. However, the Company may be exposed to cash liquidity risk under adverse market conditions or unexpected events from this or its other activities. The Company relies on uncommitted credit lines to finance its day-to-day clearing operations. Liquidity issues, whether perceived or real, could prompt these lenders to reduce the amount of financing the Company uses to conduct its clearing operations, which in turn could prompt the Company to reduce the amount of business the Company conducts and could accelerate client withdrawals. The Company must maintain continuous access to adequate and sufficiently liquid sources of capital, including equity capital and external committed facilities on acceptable terms. The Company also must maintain its ability to obtain capital and liquidity on reasonable terms because, if it is only available at a high cost, it could significantly increase its interest expense and impair its earnings.

Under adverse market conditions, cash liquidity risk related to its exchange clearing activity may rise to a level where exchanges may require the Company to satisfy obligations relating to open client positions that exceed the amount of

collateral available in its clients' margin accounts. The Company seeks to mitigate this possibility by observing all relevant exchange margin requirements, and maintaining its own- in many cases more stringent- margin requirements intended to ensure that clients will be able to cover their positions in most reasonably-foreseeable economic environments.

The Company's policy requires it to have sufficient liquidity to satisfy all of its expected cash needs for at least one year without access to the capital markets. In June 2007, the Company entered into a $1,500.0 million five-year revolving unsecured credit facility with a syndicate of banks which was amended in June 2010 to extend the lending commitments of certain borrowers and to change the aggregate commitments under the liquidity facility to $1,200.9 million ($858.9 million of which is undrawn at June 30, 2011). In addition, in June 2011 the Company's U.S. regulated broker-dealer subsidiary, MFGI, entered into a $300.0 million 364-day secured revolving credit facility with a syndicate of lenders, all of which is undrawn at June 30, 2011. To support the business' settlement and intra-day requirements, the Company also maintains committed and uncommitted credit lines with financial institutions. The Company anticipates accessing these facilities and credit lines from time to time. …

To manage its liquidity risk, the Company has established a liquidity policy designed to ensure that the Company maintains access to sufficient, readily available liquid assets and committed liquidity facilities. These facilities are available to both its unregulated and regulated subsidiaries. If the Company fails to properly evaluate the impact of adverse market conditions on its liquidity risk and adjust its liquid assets appropriately, the Company may not meet its financial obligations as they become due under normal or adverse market conditions.

*      *      *

Operational risk is the risk of loss or other adverse consequence arising from inadequate or failed internal processes, people and systems or from external events. Consistent with the Company's competitors, its operations are exposed to a broad number of these types of risks which could have a significant impact on its business. The Company further categorizes operational risk as:

- execution, delivery and process management;
- clients, products, and business practices;
- business disruption and systems failures;
- damage to physical assets;
- employment practices and workplace safety;
- financial integrity and reporting;
- internal fraud; and
- external fraud.

Operational risk is inherent in each of the Company's business areas including revenue-generating, support and control activities; therefore, the primary day-to-day responsibility for managing operational risk rests with these areas. Each area has established processes, systems and controls to manage operational risk and is responsible for escalating incidents, issues, and control indicators. Reports are summarized for senior management and governance committees. Additionally, the Company considers the operational risk in new products, systems, and business activities as they are developed or modified.

The Company maintains a continuous and collaborative Operational Risk Management Framework which ensures that an effective environment is in place to identify, assess, measure, monitor and mitigate operational risk across all of its business areas. The Operational Risk Committee, which is chaired by the Global Head of Operational Risk and is a key component of the Enterprise Risk Management Governance structure, provides oversight of the Operational Risk Management Framework and provides a forum for senior management to assess the operational risk profile of the organization. The Global Head of Operational Risk reports to the Chief Risk Officer. The Operational Risk department is a risk management and assurance function that is independent of the revenue-generating areas. The Operational Risk department's primary objective is to develop, implement, and maintain its Operational Risk Management Framework. The Operational Risk department works with all business areas to help ensure transparency, awareness, and accountability of risks.

57.    Finally, MF Global represented in the August 3, 2011 10-Q that its internal risk controls were effective and that there were no changes in the company's financial condition that would have a material effect on its financial statements:

A[t] of the end of the period covered by this report, an evaluation was carried out under the supervision and with the participation of the Company's management, including its Chief Executive Officer and Chief Financial Officer, of the effectiveness of its disclosure controls and procedures (as defined in Rule 13a-15(e) under the U.S. Securities Exchange Act of 1934 (the "Exchange Act")). Based upon that evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures were effective as of and for the period covered by this report. In addition, no change in the Company's internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) occurred during its most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, its internal control over financial reporting.

58.    The company subsequently amended the August 3, 2011 10-Q on September 1, 2011. That amendment states in part:

As previously disclosed, the Company is required to maintain specific minimum levels of regulatory capital in its operating subsidiaries that conduct its futures and securities business, which levels its regulators monitor closely. The Company was recently informed by the Financial Industry Regulatory Authority, or FINRA, that its regulated U.S. operating subsidiary, MF Global Inc., is required to modify its capital treatment of certain repurchase transactions to maturity collateralized with European sovereign debt and thus increase its required net capital pursuant to SEC Rule 15c3-1. MF Global Inc. has increased its net capital and currently has net capital sufficient to exceed both the required minimum level and FINRA's early-warning notification level. The Company does not believe that the increase in net capital will have a material adverse impact on its business, liquidity or strategic plans. In addition, the Company expects that its regulatory capital requirements will continue to decrease as the portfolio of these investments matures, which currently has a weighted average maturity of April 2012 and a final maturity of December 2012.

59.     The statements contained in ¶¶ 40–58 were materially false and/or misleading when made because:

> a.     MF Global's reported financials were not prepared in accordance with GAAP;
>
> b.     MF Global had been warned by regulators, including FINRA, that it did not have sufficient regulatory capital;
>
> c.     MF Global was materially undercapitalized;
>
> d.     MF Global lacked sufficient capital to support its transformation into an investment bank and engage in risky proprietary trading activities;
>
> e.     MF Global's internal controls and risk management controls were inadequate and not as represented;
>
> f.     MF Global's investments in foreign sovereign debt of Italy, Portugal, Ireland, Belgium, and Spain were impaired to a much larger extent than the company disclosed to investors and were placing material liquidity pressures on the company;

g.      MF Global was severely over-leveraged and faced prospective margin
        calls on its foreign sovereignty debt, which put its liquidity and capital
        position at risk of default;

h.      MF Global engaged in "window dressing" transactions at the end of the
        quarter designed to hide and disguise its leverage and debt, thus materially
        understating the company's true liabilities;

i.      MF Global was disguising the true risk levels by materially reducing
        short-term borrowings each quarter shortly before reporting its quarterly
        results; and

j.      The company, with the knowledge or acquiescence of defendants, diverted
        customer funds to cover margin calls on its deteriorating foreign sovereign
        debt positions.

60.     The statements contained in ¶¶ 40–58 about the strength, quality and effectiveness
of MF Global's risk controls and systems were materially false and/or misleading and known to
be so by defendants at the time they were made when made because:

a.      In February 2008, MF Global suffered $141.5 million trading loss incurred
        by a "rogue" broker that was enabled by deficiencies and failures in the
        risk management systems and controls.  At the time, Fitch Ratings stated
        that the "loss questions the robustness of risk measurement systems...."
        Likewise, numerous analysts expressed concern about the Company's risk
        management. For example, Bank of America cited "the questions raised
        around the company's risk-management practices...." Similarly, Credit
        Suisse analysts wrote that the "magnitude of the loss...calls into question

the degree of risk taking and risk management at the franchise."

b.    MF Global paid $90 million to settle a class action lawsuit brought by

shareholders who alleged that the company's risk management systems,

controls and procedures were not up to par.

## B.    The Truth Emerges

61.    At the beginning of the class period and before Corzine announced his "new

strategy," MF Global's stock traded at approximately $8 per share.  As the truth emerged about

MF Global, the stock price substantially declined to below a dollar.  On November 3, 2011, the

end of the class period, MF Global's stock price closed at $.23 per share.

62.    On October 24, 2011, Moody's downgraded MF Global's credit-rating to Baa3, or

nearly junk status.  Moody's cited the company's exposure to European sovereign debt as the

reason for the downgrade.  On this news, MF Global's stock price fell from $3.55 per share on

October 24, 2011 to close at $1.86 per share on October 25, 2011, a decline of more than 47% on

unusually high volume.

63.    On October 25, 2011, MF Global issued a press release announcing its financial

results for the second fiscal quarter of 2012.  The company filed this press release as an

attachment to a Form 8-K with the SEC on the same day.  In that press release, the company

stated, in part, as follows:

> **Strengthened capital and liquidity position.** As of September 30, 2011, the
> company has over $3.7 billion in available liquidity, including $1.3 billion in
> available committed revolving credit facilities and $2.5 billion in total capital.

64.    The press release quotes Corzine as stating:

> Reflecting the stressed markets in the quarter, we deliberately chose to reduce
> overall market exposure in most principal trading activities and focused on
> preserving capital and liquidity … We were particularly pleased with the
> repositioning of our mortgage, credit and foreign exchange businesses; the

performance of our commodities group; and the common alignment of our brand
to strategy.  These efforts reflect positively on our ability to execute and deliver
competitive returns to shareholders in the quarters ahead. … Over the course of
the past year, we have seen opportunities in short-dated European sovereign credit
markets and built a fully financed, laddered maturity portfolio that we actively
manage. We remain confident that we have the resources and expertise to
continue to successfully manage these exposures to what we believe will be a
positive conclusion in December 2012.

65.     Similarly, the press release quotes Steenkamp as stating:

In addition, the steps we've taken over the past year to improve our capital and
liquidity positions are of immense value in periods of uncertainty and volatility.
As a result, we are a stronger firm today with more flexibility to focus on our
strategy.

66.     During the trading day on October 26, 2011, S&P threatened to slash MF

Global's credit-rating to junk status.

67.     On October 27, 2011, both Moody's and Fitch downgraded the company's credit-

rating to junk status.  In a statement regarding the downgrade, Fitch stated:

In addition, [MF Global's] increase in principal and, to a lesser extent, proprietary
trading activities has elevated the firm's traditional risk profile.  These increased
risk taking activities have resulted in sizeable concentrated positions relative to
the firm's capital base, leaving MF [Global] vulnerable to potential credit
deterioration and/or significant margin calls.  While Fitch notes that the firm has
made some progress in rationalizing its capital structure, the firm's persistently
weak earnings and leverage are no longer consistent with an investment grade
financial institution.

68.     The market reacted to this news as the company's stock price fell from $1.70 per

share to an all-time low of $1.43 per share on October 27, 2011, a decline of more than 15% on

high trading volume.

69.     MF Global filed for Chapter 11 protection in the United States Bankruptcy Court

for the Southern District of New York on October 31, 2011.  The next day, the NYSE suspended

trading in MF Global's shares and announced plans to de-list the company from the exchange.

70.    On October 31, 2011, the first reports of missing customer funds began to emerge, as well as regulatory investigations into whether MF Global had misappropriated the funds to cover margin calls related to the company's proprietary trades.  Subsequent news reports revealed that in June 2011, FINRA had discussed whether the company should set aside more regulatory capital, and that MF Global issued bond offerings in August 2011 to raise more capital to satisfy FINRA's demands.

## C.    Scienter

71.    Defendants acted with scienter in that the defendants knew that the public documents and statements issued in the name of the company were materially false and misleading, knew that the statements would be disseminated to the investing public, and knowingly participated or acquiesced to their issuance or dissemination.  Based on their knowledge of the true facts about MF Global and their control over, receipt of, and modification to the company's materially misleading statements, and their access to confidential information concerning the company and its business, defendants participated in the fraudulent scheme.

72.    Defendants knew or recklessly disregarded the falsity and misleading nature of the information they caused to be disseminated to the investing public.  The ongoing fraudulent scheme regarding MF Global as alleged herein could not have occurred over a substantial period of time, as it did occur, without the knowledge and complicity of the defendants.

73.    Defendants had the motive and opportunity to participate in the fraudulent scheme described herein because defendants were the most senior officers and directors of MF Global, issued statements and press releases on behalf of the company, and had the opportunity to commit the fraud alleged herein.  Defendants also had the motive to disseminate the false and misleading information to artificially inflate MF Global's stock price and to promote the influx

of capital into the company. Indeed, the company raised approximately $1.6 billion in capital during the class period through a secondary offering of common stock and three bond offerings.

**D.     No Safe Harbor**

74.     The statutory safe harbor provided for certain forward-looking statements does not apply to any of the false statements alleged in this complaint. None of the statements alleged herein are "forward-looking" statements and no such statement was identified as a "forward-looking statement" when made. Rather, the statements alleged herein to be false and misleading all relate to facts and conditions existing at the time the statements were made. Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any forward-looking statements.

75.     In the alternative, to the extent that the statutory safe harbor does apply to any statement pleaded herein which is deemed to be forward-looking, defendants are liable for such false forward-looking statements because at the time each such statement was made, the speaker actually knew or recklessly disregarded the fact that such forward-looking statements were materially false or misleading or omitted facts necessary to make statements previously made not materially false and misleading, or that each such statement was authorized or approved by a director or executive officer of the company who actually knew or recklessly disregarded the fact that each such statement was false and/or misleading when made. None of the historic or present tense statements made by the defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

E.    **Loss Causation/Economic Loss**

76.    During the class period, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated MF Global's stock price and operated as a fraud or deceit on purchasers of its securities under the Plans by misrepresenting the company's financial condition and business prospects.  Once the defendants' misrepresentations and fraudulent conduct were disclosed to the market, stock price reacted negatively as the artificial inflation was removed from it.  As a result, plaintiffs and class members suffered economic loss.

77.    The defendants' false and misleading statements had the intended effect and caused the securities to trade at artificially inflated levels throughout the class period.

78.    As investors and the market became aware of MF Global's prior misstatements and omissions and that MF Global's actual financial condition and business prospects were, in fact, not as represented, MF Global's stock price reacted negatively, damaging investors.

F.    **Applicability of Presumption of Reliance: Fraud-on-The-Market Doctrine**

79.    At all relevant times, the market for MF Global's common stock was an efficient market for the following reasons, among others:

      a.    MF Global's stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange;

      b.    MF Global filed periodic public reports with the SEC during the class period;

      c.    MF Global regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and

other wide-ranging public disclosures, such as communications with the

financial press and other similar reporting services;

d.     MF Global was followed by numerous securities analysts employed

by major brokerage firms who wrote reports that were distributed to

the sales force and certain customers of their respective brokerage

firms during the class period.  Each of these reports was publicly

available and entered the public marketplace;

e.     Unexpected material news about MF Global was rapidly reflected in and

incorporated into the company's stock price during the class period.

80.     As a result of the foregoing, the market for MF Global's common stock promptly

digested current information regarding MF Global from all publicly available sources and

reflected such information in MF Global's stock price.  Under these circumstances, all

purchasers of MF Global's common stock during the class period suffered similar injury through

their purchase of MF Global's common stock at artificially inflated prices, and a presumption of

reliance applies.

**<u>COUNT I</u>**
**(Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder)**
**(By the Class Against All Defendants)**

81.     Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

82.     During the class period, defendants carried out a plan, scheme and course of

conduct which was intended to, and throughout the class period, did: (1) deceive the investing

public, including plaintiffs and other class members, as alleged herein; and (2) caused plaintiffs

and other class members to purchase MF Global stock at artificially inflated and distorted prices.

In furtherance of this unlawful scheme, plan and course of conduct, defendants, individually and as a group, took the actions set forth herein.

83.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of the company as specified herein.

84.   Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of MF Global's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about MF Global and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of the securities during the class period.

85.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  These material misrepresentations and/or omissions were made knowingly or recklessly by defendants and for the purpose and effect of concealing the company's financial condition and future business prospects from the Plan participants and supporting the artificially inflated or distorted price of the company's securities.  As demonstrated by defendants' overstatements and

misstatements of the company's financial condition and business prospects throughout the class period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

86.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for MF Global's securities was artificially inflated during the class period.  In ignorance of the fact that market prices of MF Global's publicly-traded securities were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the company's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the class period, plaintiffs and the other members of the class acquired the securities at artificially high prices and were damaged thereby.

87.     At the time of the misrepresentations and omissions, plaintiffs and other members of the class were ignorant of their falsity, and believed them to be true.  Had plaintiffs and the other members of the class and the marketplace known the truth regarding MF Global's precarious financial condition, which was not disclosed by defendants, plaintiffs and other members of the class would not have purchased or otherwise acquired MF Global stock, or, if they had acquired MF Global stock during the class period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

88.     For example, defendants knew or should have known that the company undertook huge risks on foreign sovereign debt acquired through highly leveraged repo financing, while MF Global lacked sufficient risk management controls and systems to monitor and manage those

risks. MF Global persisted despite a growing consensus that foreign sovereign debt was under severe distress, and might likely default.  To cover margin calls, MF Global diverted customer funds and likely engaged in criminal misconduct.

89.     By virtue of the foregoing, the defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

90.     As a direct and proximate result of defendants' wrongful conduct, plaintiffs and class members suffered damages in connection with their respective purchases of securities during the class period.

91.     This action was filed within two years of discovery of the fraud and within five years of plaintiffs' purchases of securities giving rise to the cause of action.

## COUNT II
### (Violation of Section 20(a) of the Exchange Act)
### (By the Class Against All Defendants)

92.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein and further alleges as follows:

93.     As alleged above, MF Global made false and misleading statements in connection with the purchase and sale of securities and participated in a fraudulent scheme and course of business or conduct throughout the class period.  This fraudulent conduct was undertaken with scienter, and MF Global is charged with the knowledge and scienter of the defendants and others who knew of or acted with reckless disregard of the falsity of the company's statements and the fraudulent nature of its scheme during the class period.  MF Global therefore violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, although plaintiffs have not named MF Global as a defendant because of the bankruptcy stay.

94.    Defendants were controlling persons of MF Global during the class period due to their senior executive positions with the company; their direct involvement in the company's day-to-day operations, including its lending practices and financial reporting and accounting functions; and their signatures on and participation in the preparation and dissemination of the company's public filings and statements.

95.    By virtue of the foregoing, defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of MF Global, including the content of its financial statements and other public statements.

96.    As set forth above, defendants acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon plaintiffs and other members of the class who purchased MF Global common stock during the class period.

97.    In ignorance of the false and misleading nature of defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for MF Global common stock, plaintiffs and other members of the class purchased MF Global common stock at artificially inflated prices during the class period.  As set forth herein, when the true facts were subsequently disclosed, the price of MF Global common stock declined precipitously and plaintiffs and other members of the class were harmed and damaged as a direct and proximate result of their purchase of MF Global common stock at artificially inflated prices and the subsequent decline in the price of MF Global common stock when the truth began to be disclosed.

98.    By reason of the foregoing, defendants are liable to plaintiffs and members of the class for violations of Section 20(a) of the Exchange Act.

**COUNT III**
**(Breach of Fiduciary Duty and/or Tortious Interference With Breach of Fiduciary Duty)**

**(By the ESPP Subclass Against the Director Defendants)**

99.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

100.    The Director Defendants had the power to control the ESPP.  The Board oversees the ESPP and is empowered  to appoint Plan administrators or to administer the ESPP itself at its option.

101.    By virtue of their position, the Director Defendants were in a superior position vis-à-vis plaintiffs and subclass members to determine the prudence in continued investment in MF Global common stock.  Further, the Director Defendants possessed special knowledge and expertise about the company such that plaintiffs and subclass members reposed confidence in their offer of MF Global common stock as part of the company's overall compensation package.

102.    The wages that plaintiffs and subclass members diverted into the ESPP were the property of plaintiffs and subclass members.  By accepting and maintaining the property of plaintiffs and subclass members, the Director Defendants assumed a fiduciary duty to preserve that property and to keep subclass members reasonably informed about all facts relevant to their participation in the ESPP.

103.    In breach of the fiduciary duty owed to MF Global employees, the Director Defendants failed to inform plaintiffs and subclass members of all of the relevant facts surrounding their investment in MF Global common stock through the ESPP.  Further, the Director Defendants breached their fiduciary duty by allowing investment in MF Global stock through the ESPP to continue, even though they knew or should have known that the investment was imprudent and likely to result in significant losses for plaintiffs and Subclass members.

104.    Defendants' breaches exceeded the scope of their authority as corporate directors.

105.    As a result of the Director Defendants' breaches, plaintiffs and subclass members have been damaged in amounts to be proved at trial.

WHEREFORE, Plaintiffs pray for judgment as follows:

a.      Determining that their suit is a proper class action and certifying plaintiffs as appropriate representatives of the class and ESPP subclass;

b.      Awarding compensatory damages in favor of plaintiffs, as appropriate, in amounts to be proved at trial;

c.      Awarding plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs and expenses; and

d.      Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand trial by a jury on all of the triable issues of this complaint.

Dated:  December 2, 2011                    Respectfully submitted,


                                            By:  _____
                                                 Amanda M. Steiner

                                            Daniel C. Girard
                                            **GIRARD GIBBS LLP**
                                            601 California Street, Suite 1400
                                            San Francisco, CA  94108
                                            Telephone:  (415) 981-4800
                                            Facsimile:  (415) 981-4846

                                            Jacob H. Zamansky
                                            Edward H. Glenn, Jr.
                                            **ZAMANSKY & ASSOCIATES LLC**
                                            50 Broadway, 32nd Floor
                                            New York, NY 10004
                                            Telephone: (212) 742-1414

Facsimile: (212) 742-1177

*Counsel for Plaintiffs*

## PLAINTIFF CERTIFICATION

I, Monica Rodngez ("Plaintiff"), hereby declare that:

1.      I have reviewed the class action complaint against Jon Corzine ("Corzine") and the other named defendants (the "Complaint") on behalf of MF Global employees and have authorized the filing of a complaint on my behalf.

2.      I did not purchase the securities that are the subject of the action at the direction of counsel or in order to participate in this private action.

3.      I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      During the Class Period specified in the Complaint, I made the following transactions in MF Global securities:

| Transaction | Trade Date | No. of Shares | Price | Aggregate (Cost)/Proceeds |
|---|---|---|---|---|

See Trade Schedule.

5.      During the three-year period preceding the date of my signing this certification, I have not sought to serve, nor have I served, as a representative on behalf of a class in a private action arising under the federal securities laws.

6.      I will not accept any payment for serving as a representative party on behalf of a class except to receive my pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative party of reasonable costs and expenses including lost wages relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of November 2011

## MONICA RODRIGUEZ

## TRADE SCHEDULE

### Long Term Incentive Plan

| GRANT DATE | TYPE | NUMBER OF SHARES | PRICE PER NOTE/UNIT | BUY OR SELL |
|---|---|---|---|---|
| 5/27/2010 | MF Global RSU | 4,177 | N/A | RSU Grant |

### Employee Stock Purchase Plan

| TRADE DATE | TYPE | NUMBER OF SHARES | PRICE PER NOTE/UNIT | BUY OR SELL |
|---|---|---|---|---|
| 6/30/2011 | MF Global Common Stock | 240 | $6.58 | Bought |



## PLAINTIFF CERTIFICATION

I, _____ ("Plaintiff"), hereby declare that:

1.     I have reviewed the class action complaint against Jon Corzine ("Corzine") and the other named defendants (the "Complaint") on behalf of MF Global employees and have authorized the filing of a complaint on my behalf.

2.     I did not purchase the securities that are the subject of the action at the direction of counsel or in order to participate in this private action.

3.     I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.     During the Class Period specified in the Complaint, I made the following transactions in MF Global securities:

| Transaction | Trade Date | No. of Shares | Price | Aggregate (Cost)/Proceeds |
|---|---|---|---|---|

See Trade Schedule.

5.     During the three-year period preceding the date of my signing this certification, I have not sought to serve, nor have I served, as a representative on behalf of a class in a private action arising under the federal securities laws.

6.     I will not accept any payment for serving as a representative party on behalf of a class except to receive my pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative party of reasonable costs and expenses including lost wages relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of November 2011

Cyrille Guillaume

# CYRILLE GUILLAUME

## TRADE SCHEDULE

### Long Term Incentive Plan

| GRANT DATE | TYPE | NUMBER OF SHARES | PRICE PER NOTE/UNIT | BUY OR SELL |
|---|---|---|---|---|
| 5/27/2010 | MF Global RSU | 21,835 | N/A | RSU Grant |
| 5/20/2011 | MF Global RSU | 6,711 | N/A | RSU Grant |